First case in our call this morning is Agenda No. 10, Case No. 107-108, Weather-Tite, Inc. v. University of St. Francis. Counsel may proceed. May it please the Court, Counsel, under the Mechanics-Lean Act and case law interpreting the Act since 1914, upon receipt of a contractor's sworn statement under Section... Counsel, I'm sorry, I should have given your name, but would you identify yourself, please? I apologize. Pamela Davis-Gorkowski for the University of St. Francis. Thank you. So under the Act and cases interpreting it, upon receipt of a Section 5 contractor's sworn statement, an owner properly pays subcontractors the amounts reflected as due to the subcontractor. This has been the law in Illinois since Knickerbocker in 1914. In Knickerbocker, the initial sworn statement given by the contractor to the owner reflected that $1,500 was due or to become due the subcontractor. In reliance on the contractor's sworn statement, the owner made payments to the contractor. By the time of the last sworn statement, the subcontractor was owed really $1,426, but the owner had retained $911. The $911 was... The Supreme Court says that the funds were withheld, but the initial statement showed $1,550 as being due. And by the time of the last statement, only $911 had been retained. That was funds that were owed on the contract between the owner and the contractor. So the initial statement showed $1,500, but by the time all the notices had been filed, $911 was retained. Was there a mistake in the mathematics, or how did that happen? It seems to say that the funds were withheld. The Supreme Court opinion says that the funds were withheld, but if you look at the appellate court opinion, it specifically says that the owner made payments to the contractor during the interim, relying on the sworn statement, but payments were not actually made. But unlike this case, the final dollars were not withheld. The final dollars were not withheld, but the funds on the earlier sworn statements in Knickerbocker also were not withheld. So some funds had been withheld, $911. We don't know the reason for withholding that. The court called it the amount that was unpaid. And you may not agree, and I understand that, but there is a factual distinction between the two cases, between Knickerbocker and this case. The only factual distinction is that some funds were held by the time of the last sworn statement, but not all of the sums that had been shown on the earlier sworn statements. How do you get around the actual language of Section 24 that says that the notice of subcontractors' claim can be provided either by the 99-day notice or through the contractor's sworn statement? Section 24 is where the subcontractor can make its own statement to the owner. And the purpose of Section 24 says that the subcontractor's sworn statement is not necessary if there's been a Section 5 affidavit. But the purpose of the Section 5 affidavit is to create the lien. So with the Section 5 affidavit, a lien is created, and so does Section 24. So you don't need the Section 24 notice to create a lien. Ms. Gorkowski, though, didn't Excel file its notice of lien more than 90 days after the work was completed? Yes, Your Honor. Now does that make a difference? It means that its rights were only created under the Section 5 sworn statement, and it did not issue its own Section 24 notice, and so there was no duty to retain funds under Knickerbocker and LUSAC. So LUSAC recites Knickerbocker as holding that an owner properly relies on the Section 5 affidavit, and the owner can rely on that affidavit that the contractor will pay the subcontractor. So in LUSAC, again, there were initial sworn statements. The owner made payments to the contractor for sums owed to the subcontractor. He made a $3,000 payment, and he specifically testified, I made the payment to the contractor expecting it to go to the subcontractor, and LUSAC held that that payment, that the lien was limited only to the amount shown to become due in the last sworn statement. So under LUSAC, that $3,000 payment made by the owner to the contractor of sums owed to the subcontractor was proper, and it was not lawful. Those are the only two cases in Illinois that reached the issue where it was contested by the parties. LUSAC makes a mistake. There's an imprecise sentence in LUSAC, and it says, if you look at the facts, it shows that the last contractor statement showed $2380 to become due, meaning that was for future work. It later makes an imprecise sentence that says, well, the lien is equal to the amount due on the last contractor statement. But if you look at the whole opinion in context, you can see that that was an incorrect statement. It was really the amount to become due. The trial court in this case read LUSAC properly. Is there a factual distinction from this case? If this case was beyond become due, didn't it deal with amounts that were already due? Our last statement said that $130,000 was due and zero was to become due. That would mean zero in our case, because the owner has an obligation to retain funds for work to become due. That means future work, but not for sums that are due specifically under LUSAC's holding, because the only lien was for the amounts shown in the last contractor statement to become due. Thank you. So again, LUSAC says this is the exact same case as Knickerbocker, and the owner properly makes payments to the contractor that's shown on the sworn statement. There's cases out there that say in DICTA that the owner has an obligation to retain funds, and that includes Snyder, which was no contractor's affidavit, so that was just DICTA, it's not a holding that's controlling in this case. ReadyMix does hold, as the appellate court held below, that when the section five affidavit requires the owner to retain funds owed to the subcontractor, but if you look at that case, the owner didn't contest that owed $127 that was listed on the subcontractor statement, so it was an uncontested holding. ReadyMix does not talk about the only two cases before that were dispositive, which is Knickerbocker and LUSAC, and so really that's a weak case that we think should be disregarded. LUSAC, in LUSAC, going back to LUSAC, the subcontractor relied on section 27, and said that the subcontractor's owner was supposed to withhold funds based on the section five affidavit, but LUSAC specifically rejected that contention and said that under section five, it's proper to go ahead and pay the, for the owner to pay the general, the amounts owed to the subcontractor based on Knickerbocker. Is it true under your argument that the sworn five sworn statement would result in the section 27 obligation to withhold funds that's never arising? Yes, Your Honor. That's an accurate statement. That's our position. How do you get around the plain language of the act? Because when the owner or his agent is notified, it's provided by this act, which I think you could, some might argue that it's done by filing the affidavit. Well, if you take a look at section five, first, section five contemplates that the owner is going to be paying the contractor. It puts a condition on the payment by the owner to the contractor of receiving the section five affidavit. If you take, continue to look at section five, there's another provision at the end that's not applicable here, but it says that when a homeowner is going to have remodeling work done on a residence, then the subcontractor has an obligation to give a notice directly to the owner, the subcontractor does. And if you look at that notice, it says that, you know, dear homeowner, subcontractors are going to be doing work on your home, and liens may arise if the contractor fails to pay the subcontractors. So section five contemplates that the owner will pay the contractor. That's how Knickerbocker reads it, that's how LUSAC reads it. Section 27 says when notified as provided in this act. And Knickerbocker and LUSAC, LUSAC specifically, finds that that does not include a section five affidavit. That different rights arise in a section 24 subcontractor's notice and a section five affidavit. The section five affidavit creates a lien, as does section 24. But if the subcontractor wants additional rights and to be paid directly under LUSAC and Knickerbocker, then the subcontractor needs to file a section 24 affidavit. If section five creates a lien for the subcontractor, doesn't that lie in the face of your argument that the owner would not be liable? Section five creates a lien on the home, but it doesn't preclude, the lien is created, but it doesn't preclude the owner paying the subcontractor through the contractor. It wouldn't take away the lien, but it doesn't. Nothing in the act says that the owner has to pay the subcontractor based on the section five affidavit. But if there is a lien against the owner's property, then can the subcontractor, even without having given the section 24 notice, proceed to enforce its lien against the owner? I think the lien is extinguished upon the payment to the contractor by the owner, and that's the holding of Knickerbocker and LUSAC. We're relying strictly on those cases rather than on the statute, and the subcontractor has very little protection under Knickerbocker and LUSAC. Well, under Knickerbocker and LUSAC, the payment that the owner made to the contractor is a lien. So our analysis is consistent with Knickerbocker and LUSAC, that the payment by the owner to the subcontractor reduces the lien. The subcontractor, I think, has less protection under a section five sworn statement than it does under a section 24. If it wants to be paid directly, it just needs to file the section 24. But if you look at section five, it contemplates that the contractor can go ahead and pay the lien. That the owner can pay the contractor. That's how it would typically be done. I think if someone has their home remodeled, you make a check to the contractor, and it's the contractor's obligation to control the subcontractors and to cut the checks and pay the subcontractor. That's the common law contractual responsibility between the parties, and the Mechanics Lien Act is in derogation of the common law, unless it's pretty expressly stated in there, we can't, you know, read the act by intent or what must have been intended. There's nothing in there that clearly mandates that the owner cannot pay the contractor for sums due to a subcontractor pursuant to a section five affidavit. And again, under Knickerbocker and LUSAC, the payments, those exact payments were found proper. And I understand that in Knickerbocker, some sums were retained, but not the entire sum that was listed in the initial contractor statements. And if there was an obligation to withhold funds under the initial, when a contractor statement is made, it would be to withhold all funds that are listed on the contractor statement, not just the last one. I mean, it really wouldn't make sense that, well, I get my first contractor statement, I'm the owner, I can pay that one, but I just can't pay the last one. That would not be something that the parties would be able to understand or know. How do I know this is the last one? How do I know when a payment's wrongful? So under section five, and under Knickerbocker and LUSAC, the owner can go ahead and pay the contractor. The lien is reduced under those cases, and it's not wrongful. And if the subcontractor wants greater rights, he has the right, he or she has the right to file a section 24 affidavit. This has been the law for 95 years in the state of Illinois. There's no reason to deviate from that course now. The owners, you know, the university was entitled to rely on the laws that existed in the reasoned analysis of those two cases, and the judgment, the appellate court judgment should be reversed, and the trial court judgment reinstated. I understand that you may be in the position of having to pay twice. Are there any other avenues open to you for collecting the bank, for instance, in a conversion theory? The bank had a lien, and they, or rather, the bank had a debt with the contractor. And they just took all the funds to satisfy their debt. Your Honor, I'm not really... Go ahead. I apologize. Are there other avenues open to you? As I understand it, the case law establishes the right of the bank to the set-off. I'm not really familiar with that case law. Your avenue would be to proceed against the owner, would it not? I'm the owner, Your Honor. Or, excuse me, against the contractor. The contractor is bankrupt, as I understand it. If you had to pay twice, you would be paying more than your contractual agreement. So your only avenue of relief would be against the contractor for not paying the subs. That's correct. In general, that's correct, except here, as I understand it, the contractor is bankrupt, and we don't have an avenue there. Thank you. Thank you very much. You may proceed, sir. May it please the Court, Justices, Counsel, my name is Douglas Schlack. I'm the attorney for Accel Electric, the Appley, in this case. I'd like to spend a short time responding to the University's argument, and then I would like to address the issues as the other avenues or remedies in this case. The appellant raises basically three issues. The first issue raised ---- Mr. Schlack, before you get into that, can I ask you something kind of from a policy that might help frame the arguments? Section 5 mandates not only that a sworn statement, but also that the statement set forth both the names of all the subcontractors and, quote, the amounts due or to become due to each. And my question is, won't it always be the case that the owner is on notice of a subcontractor's claim? Under Section 5, yes, because of the requirements of the affidavit. What is the purpose of the affidavit? And in light of that, won't that mean that the owner always must hold back from the contractor the amount of each of such claims? Not necessarily. LUSAC dealt with that issue. In the LUSAC case, there is a statement in there where they're dealing with Scarlett Glow, and the appellate court in that case said what Scarlett Glow failed to recognize, that at the time that third payout was made, there was still $55,000 yet to come due to the contractor. There were supposed to be two more payments, and that amount was more than sufficient to cover Scarlett Glow's claim. Unfortunately, subsequent to the third payout and prior to the fourth, there was a fourth contractor's affidavit in that case, but there was never any payment on it. Somewhere in there, and we're not told exactly when, the general contractor breached the contract. If you also look at Section 27, Section 27 specifically says you are required to withhold funds to cover the subcontractor from the amount due or the amount to become due. When you're dealing with multiple affidavits, initially the first affidavit, second affidavit, if you're going to have five payouts like we had in this case, the first, second, third payout, you probably have sufficient funds left to come due the contractor from which, if the contractor on the first or second payment doesn't pay the subcontractors, the payment can be withheld and taken out of that fourth or fifth payment to satisfy the subcontractors. When you get down to the last payment, as we have in this case, the final payment, the fifth payment, there were no more funds to come due. If the subcontractor was to get paid at all, the owner has to withhold those monies from that final payment. They could issue two-party checks, they could pay the subcontractors directly, could have used an escrow with a title company. They didn't do any of those. My point in the question is that if under Section 5 the owner is always on notice, and in light of that would have an obligation to hold back, I'm trying to see from a public policy standpoint, what's the use of having a general contractor in those situations as owner? They're put on notice. They're required to hold back under Section 5. They have to ultimately then pay the subs directly. Why have a general? Well, the general contractor serves... Do you need a general contractor? On some construction projects, depending on who the owner is, maybe you don't. If the owner can go out and get the subcontractors so that the subcontractors would then be contractors to the owner. But in most cases, and especially in a commercial project like this was, you need a general contractor to handle, organize the project, to hire the subcontractors because typically the owner is not going to know which subcontractors to hire. But you can't rely on them for paying their subs. I'm going to say yes and no. I go back to as long as there's sufficient funds yet to come due the contractor to cover the amounts due the subcontractor, could you pay the subcontractor? Yes. You're assuming the subcontractor is going to pay the subs. If you find out the subcontractor are not getting paid and there's sufficient funds left due the contractor, you can take the funds out of that amount that's due the contractor and pay the subs. I'm a little bit confused about retainage and how that works. In view of the fact that the contract here obligated payment from the owner directly to the contractor, what is the contractor supposed to do or what is the owner supposed to do? Hold back money the contract provides otherwise? Well, the contract, the privity of the contract is between You add one more thing to that. You were aware of that clause in the contract, the subcontractor, that payment was to be made directly from the owner to the contractor. I don't know that that was in our subcontract. In the contract between the university and Stonehenge, which we were not privy to, there may have been There clearly was a contract between the contractor and the owner? I believe there was. We never saw the contract. I don't believe that it ever became a factual issue in the case whether there was a contract or not. And I may be wrong, but I thought I read somewhere in the briefs that at least initially there was no contract between the owner and the contractor. I don't recall that, Justice. I've always assumed that there was a contract because of the size of the project. You never saw it? I never saw it. And I don't believe it was ever put into evidence. We basically at the trial court level, all the subcontractors, the university stipulated to the pertinent facts of the case, and there was no evidence produced. It was dealt with strictly on summary judgment motions. We considered it an issue at law. Under your response, counsel, about payment under the Section 5 affidavit, and you said yes and no, if there's still enough left in the contract, they can probably go ahead and pay it and so forth. How would an owner know, particularly on a big project where there are lots of subs? Wouldn't it be more likely that all of the subs aren't going to get paid? Aren't you putting the owner in a position of from day one making a gamble when they pay out anything without paying it to the sub? I don't think so, Justice. One thing that runs through all these cases is that the owner can rely on the contractor's affidavit and what it's set forth in there unless they receive a notice from the subcontractor pursuant to Section 24A, which then would override whatsoever in the contractor's affidavit. If you have five payouts like we had in this case, and they had paid the contractor directly on the first payout, and then when they get the second affidavit, it shows the subcontractors were in fact paid, they can rely on that. Now, if it showed that the subcontractors hadn't been paid or they had received that Section 24A subcontractor's notice, then the owner would be on notice that there's a problem here, these people aren't getting paid, and he is required under the Act to withhold the funds to make sure those subcontractors get paid. Mr. Schlack, I just have a question, though, with regard to the 90-day notice. Didn't the university pay Stonich and Fulb in January 2006, and that Excel did not file its lien with the university until February? Correct. So how would they have notice? On the final and fifth payout, there was no funds left to protect the subcontractors with, and in that case, they were required under Section 27 to withhold the appropriate funds to make sure those subcontractors were paid. Now, we filed our 90-day notice within the 90-day time frame. However, it was filed after the payout had already been made. Now, in our case, we did additional work after the final contractor's affidavit, and our notice was for $140,000. However, under the Act, we are only allowed to claim the amount that was set forth in the Section 5 contractor's affidavit, which was $130,948.48. But you're saying the burden is on the owner now to just withhold money not knowing, not even having received a notice. Yes. I believe that is the intent of the Act. That's what the Act says.  And how long is an owner supposed to wait to receive or even know if they're going to receive another notice before any payout? They don't have to wait, Justice. What they were required to do under the Act is when they got that last contractor's affidavit, they are required, and they are the ones in the position that can do that, to protect the subcontractors. That is what the Act says. Don't they assume that the contractor is going to pay the subcontractors out of that money that they've paid? Normally, the university would think that, well, I'm giving the amount of money within the amount that they have said, the $130,000 or something like that, to pay the subcontractor. They have to assume the contractor is going to pay them. Well, they can, but if they make that assumption, I believe the case law in this State and the Act itself says they're at risk. If the contractor doesn't pay the subcontractor, then the university puts itself in the position they may have to pay twice. Counsel, if I may follow up. The payments were made four times. Correct. And the fifth time, the money was sent to the bank. Is that correct? The money was wire-transferred to the Stone & Shoes account at the bank, and Harris Bank exercised their right of full offset. And that occurred – when did that occur in relationship to the university sending the money to the county? The same day. It happened – the money was wire-transferred by the title company. The university paid the title company. It wasn't handled as a construction escrow. They were just a conduit through which the money was paid. The title company wire-transferred the funds into Stone & Shoes' account at Harris Bank on the 20th of January. Harris Bank offset the funds upon receipt. It was after the university had sent the money in, though.  I mean, when the money hit the account, they offset it. When did they get notice of the offset, if ever? We got notice of the offset when the checks bounced. Does that make any difference in this case at all? Is that a fact? Is it significant? I believe it's a significant fact, but it's not an issue that we have argued in this case. If the court wants to stop me, I will address that issue, but when I first got this case, what I looked at was going after Harris Bank on a constructive trust theory. Unfortunately, we're in the third district, and there are two cases in the third district – the East Peoria Community School District case versus Grand Stage Lighting 1992 case and the Brant v. Uptown National Bank case, which is a 1991 case. The East Peoria School District case is essentially on all fours with our case. It's a situation where the owner deposited the money with the general contractor, the bank offset. The subcontractors sued the bank on a theory of constructive trust, and the third district basically said, relying on Brant, that the right of offset by the bank supersedes or is superior to any constructive trust argument on behalf of the subcontractors unless there's an actual or written trust. They relied on the opinion written by Judge Stauder or Justice Stauder in 1991 in the Brant case. And what he basically said is without the actual or written trust, there's no constructive trust theory. He also went on and said the logical conclusion of the plaintiff's argument would be that any debtor of any account depositor would have a claim against the account that would limit the rights of offset of the bank. There's also a case in that he distinguished that case from the second district case in 1988, which was the Gluth Brothers v. Union National Bank case, which dealt with a similar issue. In that case, there was a joint venture agreement between his two contractors and the engineering company. And there was a specific provision in that joint venture agreement that the funds were to be held in trust until all obligations were paid. The funds were deposited in the account of the engineering company and Union National Bank offset. In that case, the second district, relying on a case from this court in 1977, Ray v. Winter, and also a bankruptcy case from the northern district of Illinois in Ray Tongin, found that there was a constructive trust and the bank did not have a right to offset. And in doing so, they relied on the in Ray Tongin, the northern district bankruptcy case, and said basically if the bank has knowledge that their depositor is customarily in the business of depositing money in his account in which others have a right and the bank is aware of an individualized deposit or series of deposits, there is a query the bank has to make as to who is rightfully entitled to those deposits. In addition, if you look at Section 21.02 of the Act, which was added in 1997, it specifically creates a constructive trust on behalf of the subcontractors when the contractor accepts the waiver of lien. Now in a lot of situations, the contractor will go to the subcontractor and say, I need your waiver, got to give it to the owner so that I can get paid and then I'll pay you guys. If that happens, under 21.02, there is specifically a constructive trust. In this case, I believe, had Stonich came to my client Excel and said, I need your waiver to get paid, and he had given him the waiver, which did not happen, I would have had a constructive trust argument and I think I could have recovered from Harris Bank, pursuant to 21.02 of the Act. My position, I think the simple fact that Harris Bank was able to offset those accounts when actually that money was deposited there on behalf of the subcontractors by the university was wrongful. I think Harris could have taken that share of the money that would belong to Stonich, but to offset that account, and they knew where the money came from, they knew the purpose of the money, and they knew the money was there to pay the subcontractors. To say, because my client didn't give a waiver before the money was paid out by the university to Stonich, there shouldn't be a constructive trust where if there had been a waiver, there would have been a constructive trust under 21.02 of this Act? Councilman, I believe your time is up. Thank you, Justices. Council, State said- Let me clarify something before you start. Was there a contract between the university and the contractor requiring payment? You know, I just always assume there was. I mean, there had to be a contract, some kind of contract, and I would assume there was a written contract, and other than that, I don't know. I look quickly in my appendix, and I don't see it. Council, State, that case law requires the owner to retain funds under the Section 5 affidavit, but he doesn't tell us what that case law is. And, again, under Knickerbocker and Lusak, payments made by the owner to the contractor pursuant to this foreign statement were proper, and that's the law in Illinois. The only other case that's contrary to that is the Ready Mix case, and, again, that's an uncontested case where the owner admitted that he owned $127, and that case doesn't make any analysis of the precedent that was in existence at the time when it was decided, including Lusak and Knickerbocker. It doesn't make any analysis of the act, and that's the only case out there where the facts are actually an issue. Mr. Schlack and you both apparently agree whether there was a written contract or not is not germane and are not relevant as far as the issues before this Court at this time. Is that correct, since we don't know whether there was one? I mean, we've assumed that there was a contract that required payment from the owner to the contractor. That is a relevant fact, but I can't point you to that contract. What I was going to get to is something that Mr. Schlack touched on. That was the lien waivers. Would it be relevant to our inquiry or even public policy as to what the act is intended, who the act is intended to protect if the contract provided for, or obviously the owner can always request lien waivers before payment is made out, which would require the contractor to get a lien waiver from the subcontractor before payment was made. Do you know whether that was in the contract or not? I do not know. If there is a contract that required payments directly from the owner to the contractor, would that override the provisions of the act? I apologize, Your Honor. I think that under Section 27, assuming that were to be applicable and controlling here, that section says that, I'm paraphrasing, notwithstanding the contracts between the parties, a payment by the contractor to the subcontractor is proper. Would you like me to find that exact language? So under that section, assuming it were applicable,  but because it's in derogation of the common law, which would enforce the contracts as written, the act needs to be strictly construed and it has to be pretty well expressly stated that that's the result. It can't be derived by, like, intendment or it must be what the legislature intended. It has to be strictly construed. That's my analysis. There's no reason to deviate from Knickerbacker. It's been the law in the state of Illinois for many years, and the university would like to see Knickerbacker and LUSAC continue to be the law in Illinois, and, again, the university properly relied on the laws that existed. Thank you. Thank you. Thank you, counsel. Case number 107-108 will be taken under review.